IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS

Tisha Olson                                                                                          Plaintiff

No. 3:11-CV-068-HDY

Michael J. Astrue, Commissioner,                                                      Defendant
Social Security Administration

**ORDER AFFIRMING THE COMMISSIONER'S DECISION**

In this case,[1] plaintiff-claimant Tisha Olson (nee Tisha Nunally[2]) sought judicial review of defendant Commissioner Michael J. Astrue's denial of her application for Supplemental Security Income (SSI).[3] Olson asked the court to reverse the Commissioner's decision and remand her case to the Social Security Administration (SSA) for the award of benefits.[4] The undersigned has authority to resolve this case because the parties consented to the jurisdiction of the magistrate judge.[5] After considering the record, the arguments of the parties, and the applicable law, this court affirms the Commissioner's decision.

**Scope of judicial review**.  In reviewing the denial of an application for SSI, the

---

[1]Docket entry # 2.

[2]About half of the documents relevant to this case reflect Olson's maiden name.

[3]SSA record at p. 10 (ALJ's unfavorable decision).

[4]Docket entry # 2, p. 2.

[5]*See* 28 U.S.C. § 636(c); docket entry # 4.

court must determine whether "the Commissioner's findings are supported by substantial evidence on the record as a whole."[6] "Substantial evidence is relevant evidence that a reasonable mind might find adequate to support the Commissioner's decision."[7] In assessing the substantiality of the evidence, the court must consider evidence that detracts from the Commissioner's decision as well as evidence that supports it.[8] The court may not reverse the Commissioner's decision simply because substantial evidence supports a different result.[9] The Commissioner's decision may not be based on legal error.[10]

**The impairment underlying Olson's application**. Olson's application flowed from an ATV accident that occurred on July 30, 2007, when Olson was 16 years old. Olson swerved to miss another ATV and caused the ATV to roll over three times.[11] The accident left Olson with a burst fracture at T6 and T7 of the thoracic spine.[12] In laymen's

---

[6]*Moore ex rel. Moore v. Barnhart*, 413 F.3d 718, 721 (8th Cir. 2005).

[7]*Moore*, 413 F.3d at 721.

[8]*Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

[9]*See Neal ex rel. Walker v. Barnhart*, 405 F.3d 685, 688 (8th Cir. 2005).

[10]*Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997) (explaining that the Commissioner's decision must not be based on legal error).

[11]SSA record at pp. 224 & 260.

[12]*Id*. at pp. 198, 209 & 294.

terms, the accident broke Olsen's back. The accident also fractured a couple of ribs.[13]

Olson's mother applied for SSI on Olson's behalf.[14]

One week after the accident, Dr. Richard McCarthy—an orthopaedic surgeon—performed a posterior stabilization from T3 to T11.[15] The procedure stabilized Olson's thoracic spine using a bone graft from the right iliac crest bone (bone in the hip), two titanium rods, and multiple screws.[16] Although the medical records do not indicate why the surgery took place so long after the accident, Olson testified that Dr. McCarthy was the only doctor who would operate on her.[17]

Olson was discharged from the hospital four days later, with instructions to walk

---

[13]*Id*. at p. 294.

[14]*Id*. at p. 110.

[15]*Id*. at p. 198.

[16]*See* Sam Wiesel, M.D. and Laura Obiso, 4-13A Attorneys' Textbook of Med. (3d ed.) P 13A.60 ("Surgical stabilization has two components. The first component is arthrodesis, or fusion. The goal of fusion is to induce adjacent vertebrae above and below the injury to heal together into a solid block of bone, eliminating any potential movement between them. This usually involves placement of a bone graft between the vertebrae. Bone grafts may be placed anteriorly, between adjacent vertebral bodies, or posteriorly, between adjacent laminae, facets, or transverse processes. The second component of surgical stabilization involves internal fixation. Internal fixation provides immediate strength and maintains anatomic alignment during the time it takes for fusion to occur. Internal fixation usually involves the implantation of some combination of wire, hooks, screws, and/or rods.").

[17]SSA record at p. 44.

daily and to use a thoracic lumbar sacral orthotic (TLSO) whenever she was up.[18]  A TLSO is a plastic support that fits over the chest, abdomen and upper pelvis to support an unstable spine.  Olson called the TLSO a body cast.[19]

Four months after her surgery, Olson began physical therapy.[20]  Less than five months after her surgery, Dr. McCarthy released Olson from wearing the body cast, instructed Olson to continue "doing muscle strengthening," and to return in six months.[21]

**The Commissioner's decision**.  Olson's mother applied for SSI before Olson turned 18 years old.  Olson turned 18 before the Commissioner's administrative law judge (ALJ) issued the unfavorable decision.  Because the disability-determination process is different for a clamant under age 18 than a claimant who is at least 18, the ALJ evaluated Olson's application using both processes.[22]

The child process.  At step one of the childhood-disability-determination process, the ALJ determined Olson had not engaged in substantial gainful activity since her ATV

---

[18]*Id*. at p. 215.

[19]*Id*. at p. 45.

[20]*Id*. at p. 361.

[21]*Id*. at p. 353.

[22]*See* 20 C.F.R. § 416.924 (child process); 20 C.F.R. § 416.920 (adult process).

4

accident.[23] At step two, the ALJ determined Olson had severe physical impairments before she turned 18; specifically, fracture of the thoracic spine and vertebral fracture with spine cord injury.[24] At step three, the ALJ determined Olson's impairments did not meet or medically equal an impairment listed in the Commissioner's regulations. The ALJ also determined that Olson's impairments did not functionally equal a listed impairment.[25] Thus, the ALJ concluded that Olson was not disabled before age 18.

The adult process. The ALJ did not make a specific finding at step one of the adult-disability-determination process, having already determined that Olson had not engaged in substantial gainful activity. At steps two and three, the ALJ determined that Olson had the same severe impairments, but the impairments did not meet or medically equal a listed impairment.[26] At step four, the ALJ determined that since turning 18, Olson had the residual functional capacity (RFC) to lift 20 pounds occasionally and 10 pounds frequently; and to sit 6-8 hours in a 8-hour day, 1-2 hours without interruption.[27] The ALJ found that Olson's capacity to stand was limited and that Olson needed a sit/stand option. The ALJ also found that Olson could not reach overhead

---

[23]SSA record at p. 14.

[24]*Id*. at p. 15.

[25]*Id*. at pp. 18-22.

[26]*Id*. at p. 22.

[27]*Id*.

with her left arm due to shoulder pain. At step five, the ALJ consulted a vocational expert and determined Olson was capable of making a successful adjustment to work that existed in significant numbers in the national economy.[28] Thus, the ALJ concluded that Olson was not disabled since turning 18.

**The disputed issue**. The parties do not dispute whether the ALJ followed the required processes. Instead, the parties dispute whether Olson's physical impairment met the disability duration requirement. Olson argued that the ALJ placed too much weight on Dr. McCarthy's last office note. She insisted that the ALJ misinterpreted the note to mean that she had healed to a degree that she could play softball and that the ALJ disregarded her testimony to the contrary.[29] Despite this complaint, substantial evidence supported the ALJ's determination that Olson's impairments did not meet the duration requirement.

To be considered disabled—and thus eligible for SSI—a person under age 18 must show she "has a medically determinable physical…impairment, which results in marked and severe *functional* limitations, and which can be expected to result in death or which has lasted or can be expected to last *for a continuous period of not less than 12*

---

[28]*Id*. at p. 24.

[29]Docket entry # 9, pp. 5-10.

*months*."[30] To be "severe," a child's impairment must result in more than minimal functional limitations.[31] If a child has a severe impairment, the Commissioner must consider the child's age-appropriate functioning in relation to: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving around and manipulating objects; (5) caring for oneself; and (6) health and physical well being.[32] If a child's impairment causes an "extreme" limitation in one of these functional domains, or a "marked" limitation in at least two domains, "*and if the twelve-month durational requirement is met*, disability is established."[33]

Olson's impairments implicated the latter three domains; however, the ALJ relied on Dr. McCarthy's office note in considering the domain of "moving about and manipulating objects."[34] That domain applies to how the claimant can move her body

---

[30] 42 U.S.C. § 1382c(a)(3)(C)(i) (italics added).

[31] *See Neal ex rel. Walker v. Barnhart*, 405 F.3d 685, 688 (8th Cir. 2005) (Under this step, if the impairments result in no more than minimal functional limitations, the impairments are not severe and the child is not disabled."); *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853, 854 (8th Cir. 2003) ("Under the second step, if the impairments result in no more than minimal functional limitations, the impairments are not severe and the child is not disabled.").

[32] 20 C.F.R. § 416.926a(a)(1)(i)-(vi).

[33] *Garrett ex rel. Moore v. Barnhart*, 366 F.3d 643, 647 (8th Cir. 2004) (italics added).

[34] SSA record at p. 20.

from one place to another and how can she move and manipulate things.[35] The ALJ determined that Olson had less than a marked limitation in the domain, observing that Dr. McCarthy released Olson five months after her accident and "stated she would be able to play softball and resume her normal activities."[36]

> In general, [m]oving your body involves several different kinds of actions: Rolling your body; rising or pulling yourself from a sitting to a standing position; pushing yourself up; raising your head, arms, and legs, and twisting your hands and feet; balancing your weight on your legs and feet; shifting your weight while sitting or standing; transferring yourself from one surface to another; lowering yourself to or toward the floor as when bending, kneeling, stooping, or crouching; moving yourself forward and backward in space as when crawling, walking, or running, and negotiating different terrains (e.g., curbs, steps, and hills).
>
> Moving and manipulating things involves several different kinds of actions: Engaging your upper and lower body to push, pull, lift, or carry objects from one place to another; controlling your shoulders, arms, and hands to hold or transfer objects; coordinating your eyes and hands to manipulate small objects or parts of objects.[37]
>
> As an adolescent, you should be able to use your motor skills freely and easily to get about your school, the neighborhood, and the community. You should be able to participate in a full range of individual and group physical fitness activities. You should show mature skills in activities requiring eye-hand coordination, and should have the fine motor skills needed to write efficiently or type on a keyboard.[38]

---

[35] 20 C.F.R. § 416.926a(j).

[36] SSA record at p. 20.

[37] 20 C.F.R. § 416.926a(j)(1)(i) & (ii).

[38] 20 C.F.R. § 416.926a(j)(2)(v).

Logically, an adolescent with a broken back, or an adolescent wearing a body cast following spinal stabilization, would be limited in moving her body from one place to another, and perhaps in moving and manipulating objects. The dispositive question is whether Olson was limited for a continuous period of at least 12 months. The following evidence supported the ALJ's decision that Olson was not limited for a continuous period of at least 12 months: (1) Dr. McCarthy's treatment notes, (2) Olson's discharge from physical therapy, and (3) evidence of Olson's subsequent activities.

<u>Dr. McCarthy's treatment notes</u>. Olson saw Dr. McCarthy twice after her hospital discharge. On September 24, 2007—one month and 17 days after her surgery—Olson had no complaints other than some cutaneous (pertaining to the skin) numbness on her right thigh from positioning during surgery.[39] Dr. McCarthy reported that Olson could fully forward bend and back bend without difficulty; she could also side bend without problems and she had normal heel-toe gait. Xrays showed good alignment and good position to her fracture. Dr. McCarthy reported that Olson was healing quite well, but cautioned that Olson must be cautious for first 4 to 6 months.

Olson returned to Dr. McCarthy for a follow-up visit on January 2, 2008—4 months and 26 days after surgery. Olson "had some complaints about her left leg going out from under her," but the "sensation overall in her left leg ha[d] improved, and her

---

[39]SSA record at p. 270.

motor function ha[d] improved as well."[40]  Dr. McCarthy reported that Olson had "some single-toe-rise weakness on the left side, but she [was] able to do it." Xrays showed that she had good alignment and good fusion taking place.  Dr. McCarthy recommended discontinuing the brace, continuing with muscle strengthening, and returning in six months.  Dr. McCarthy opined that Olson would be able to play softball, but recommended no physical education and no full-contact sports for the time being.

  Dr. McCarthy's treatment notes supported the ALJ's determination because Dr. McCarthy observed no limitations preventing Olson from using her motor skills to freely and easily to get about her school, the neighborhood, and the community. Although Dr. McCarthy restricted Olson from participating in a full range of individual and group physical fitness activities for the time being, he opined that Olson would heal enough to play team sports.  Dr. McCarthy likewise observed no limitations in activities requiring eye-hand coordination or the fine motor skills needed to write efficiently or type on a keyboard.

  <u>Olson's discharge from physical therapy</u>.  Olson began physical therapy on December 17, 2007—4 months and 7 days after her accident.  She completed her physical therapy on February 27, 2008—6 months and 28 days after her accident.  At

---

[40]*Id*. at p. 353.

discharge, Olson's physical therapist found the following: active lumbar motion was within functional limits , active thoracic motion was normal, lumbar muscle test was normal, thoracic muscle test was normal, thoracic muscle length was normal, and back muscle strength was within normal limits.[41]  The physical therapist recorded Olson's pain as having decreased from 5 to 0 using a pain scale of 1 to 10.  The physical therapist's discharge findings supported the ALJ's determination because the findings reflected no limitations in moving the body from one place to another.

<u>Evidence of Olson's subsequent activities</u>.  The record contained no additional medical records about treatment for Olson's back, but subsequent medical records are probative of Olson's daily activities.  Most of those records documented pre-natal and after-birth care.

On March 13, 2008—7 months and 13 days after the ATV accident—Olson's first pregnancy ended in a miscarriage.[42]  Her physician recorded no functional limitations during office visits.[43]

On March 25, 2008—7 months and 25 days after the accident—Olson went to the

---

[41]*Id*. at pp. 361-65.

[42]*Id*. at p. 584.

[43]*See id*. at 605 (Mar. 6, 2008); p. 594 (Mar. 10, 2008); p. 592 (Mar. 13, 2008); p. 584 (Apr. 2, 2008).

hospital emergency room and reported that her left leg gave way, causing her to fall.[44]

She complained about a twisted right ankle. Xrays of the right ankle were normal.[45]

She was released with a walking boot and Tylenol.

On April 9, 2008—8 months and 10 days after the accident—Olson sought a pre-participation physical evaluation to play softball.[46] The examining physician cleared Olson to play if she got a letter from her back doctor.

On July 1, 2008—11 months and 1 day after her accident—Olson went to the hospital emergency room and complained about a leg burn.[47] Olson reported that she burned her leg on the tailpipe of a motorcycle. She had no other complaint, except for poison ivy.

Evidence of Olson's activities after completing her physical therapy supported the ALJ's determination because it showed that Olson engaged in a wide range of physical activity within 12 months of her accident. Notably, Olson did not return to Dr. McCarthy event though he advised her to return in six months.

The foregoing evidences constituted substantial evidence because it related to the 12-month period following the ATV accident and because a reasonable mind would

---

[44]*Id*. at p. 796.

[45]*Id*. at 799.

[46]*Id*. at p. 827.

[47]*Id*. at p. 821.

consider the evidence adequate to support the ALJ's determination that Olson had less than a marked limitation in moving the body or manipulating things. Olson argued that the ALJ misinterpreted Dr. McCarthy's office note as a release to play softball, but nothing in the opinion supports that interpretation. Olson testified that one year after her accident she still could not walk that well and continued to fall,[48] but her activities contradicted her testimony. The ALJ did not err in determining that Olson was not disabled before turning 18.

To the extent Olson relied on her impairments after turning 18, her medical records after turning 18 supported the ALJ's decision that Olson's impairments did not meet the duration requirement. Like a child SSI claimant, an adult SSI claimant must have a "physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last *for a continuous period of not less than twelve months*."[49] Olson's medical records after turning 18 documented two pregnancies, but no limitations in exertional functions such as sitting, standing, walking, lifting, carrying, pushing, and pulling. Nevertheless, the ALJ recognized that it was sometimes difficult for Olson to stand for long periods of time and to reach overhead with her left arm. The ALJ incorporated those limitations in Olson's RFC.

---

[48]*Id.* at p. 46.

[49]42 U.S.C. § 1382c(a)(3)(A) (italics added).

13

At the time of her hearing on December 4, 2009, Olson was caring for a six-month-old baby. The child was born on June 5, 2009—1 year, 10 months and 5 days after the ATV accident.[50] Olson testified that she wanted to become a teacher and she thought she could do it if she could switch between sitting and standing.[51] Taking care of an infant and planning to become a teacher contradict Olson's allegation of disability. The ALJ did not err in determining that Olson was not disabled since turning 18.

**Conclusion**.  Having determined that substantial evidence supports the Commissioner's denial of Olson's application for SSI, the court DENIES Olson's request for relief (docket entry # 2) and AFFIRMS the Commissioner's decision.

It is so ordered this __17__ day of July, 2012.

_____
United States Magistrate Judge

---

[50] SSA record at p. 502.

[51] *Id*. at p. 48.